IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF UTAH CENTRAL DIVISION

| | |
|---|---|
| PHILLIP M. LEISHMAN,<br><br>        Plaintiff,<br>v.<br><br>TOM PATTERSON et al.,<br><br>        Defendants. | **MEMORANDUM DECISION & ORDER**<br><br>Case No. 2:11-cv-00309 CW<br><br>Judge Clark Waddoups |

      Plaintiff, Phillip M. Leishman, an inmate at Utah State Prison (the "Prison"), filed this *pro se* civil-rights suit. *See* 42 U.S.C.S. § 1983 (2014). At the court's request, Defendants filed a *Martinez* report addressing Plaintiff's allegations. (Dkt. No. 48.) At the same time, Defendants filed a Motion for Partial Summary Judgment and Supporting Memorandum on Plaintiff's claims regarding wooden runes. (Dkt. Nos. 49 & 50.) Defendants later supplemented the *Martinez* report, (Dkt. Nos. 56–62), and filed another Motion for Partial Summary Judgment that addressed Plaintiff's claims about group worship, (Dkt. No. 63). Both motions are now fully briefed and before the Court.

### I. INTRODUCTION

      Plaintiff is an adherent of the "ancient Norse Spiritual tradition known as Asatru, (also Odinism)." (Compl., ¶ 4, Dkt. No. 6.) His Complaint asserts claims under §§¶ 1983 and 1985, the First and Fourteenth Amendments, and the Religious Land Use and Institutionalized Persons Act of 2000 (the "Religious Land Act"), based on alleged interference with his right to exercise freely his religion. Specifically, he alleges that Defendants infringed on his religious rights by

denying his requests for rune sets made of a natural substance, such as wood, and the possibility of conducting Blot ceremonies. Plaintiff also asserts an Equal Protection claim that Defendants have allowed other inmates of different religions to possess items similar to the rune sets and to conduct worship services.

Plaintiff's Complaint names Defendants in both their individual and official capacities and seeks declaratory and injunctive relief, compensatory and punitive damages and costs.

Defendants move for summary judgment on each of Plaintiff's claims, asserting they have lawfully accommodated Plaintiff's religious practices while taking into account the nature of the requested materials and activities, overall prison security, and the safety of inmates and staff. Defendants further assert that even if Plaintiff could show a constitutional violation Defendants are entitled to qualified immunity because the rights at issue were not clearly established at the time of the alleged acts. Plaintiff argues against each of Defendants' points.

## II. FACTS[1]

1. Plaintiff, Phillip Leishman, is an inmate in the custody of Utah Department of Corrections (DOC), and is currently housed at the Prison.

2. Plaintiff is an adherent of the Asatru religion.

3. Prison policy allows inmates to possess rune cards made of paper or plastic. (Decl. Craig Burr, Ex. 1 to *Martinez* Report, ¶ 6, Dkt. No. 48-1.) The cards are similar to playing cards. (*Id.*)

4. Prison policy also allows inmates to have "one approved religious symbol in their possession." (*See* FDr 14, "Inmate Property," Ex. 3 to *Martinez* Report, Dkt. No. 48-3.) The symbol must comply with the Inmate Property Matrix, with certain exceptions. (*Id.*)

---

[1] The material facts presented here are drawn from Defendants' Motions for Partial Summary Judgment (Dkt. Nos. 50, 63).

2

5. Plaintiff requested wooden rune tiles. (Compl., ¶ 21, Dkt. No. 6.) Plaintiff believes that "[n]o synthetic substitute can retain [the energies and divinity of Life]." (*Id.*)

6. Plaintiff was offered a rune set made from synthetic material and he declined the offer. (Compl., ¶ 28, Dkt. No. 6.)

7. Plaintiff has not been able to conduct a religious Blot ceremony for more than ten years. (Compl., ¶ 22, Dkt. No. 6.)

### III. SUMMARY JUDGMENT STANDARD

"The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant, asserting there is no genuine dispute about material facts, must support his assertion "by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials; or . . . showing that . . . an adverse party cannot produce admissible evidence to support the fact." *Id.* 56(c). A main purpose of the summary-judgment rule "is to isolate and dispose of factually unsupported claims or defenses." *Celotex v. Catrett*, 477 U.S. 317, 324 (1986). The party moving for summary judgment has the initial burden of showing "that there is an absence of evidence to support the non-moving party's case." *Id.* at 325. This burden may be met merely by identifying portions of the record showing an absence of evidence to support an essential element of the opposing party's case. *Johnson v. City of Bountiful*, 996 F. Supp. 1100, 1102 (D. Utah 1998).

Once the moving party satisfies its initial burden "the burden then shifts to the nonmoving party to make a showing sufficient to establish that there is a genuine issue of

material fact regarding the existence of [the disputed] element." *Id.* Federal Rule of Civil Procedure 56 requires a nonmovant "that would bear the burden of persuasion at trial" to "go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of a trial from which a rational trier of fact could find for the nonmovant." *Adler v. Wal-Mart Stores*, 144 F.3d 664, 671 (10th Cir. 1998). The specific facts put forth by the nonmovant "must be identified by reference to an affidavit, a deposition transcript or a specific exhibit incorporated therein." *Thomas v. Wichita Coca-Cola Bottling*, 968 F.2d 1022, 1024 (10th Cir. 1992). Mere allegations and references to the pleadings will not suffice. The nonmovant must cite to materials that would be admissible at trial to create a material issue of fact. Fed. R. Civ. P. 56(c). The court, however, must "examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Lopez v. LeMaster*, 172 F.3d 756, 759 (10th Cir. 1999).

## IV. <u>DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT</u>

Defendants move for summary judgment on each of Plaintiff's claims, asserting that Plaintiff has not presented sufficient evidence to show a constitutional violation or a Religious Land Act violation. Defendants further assert that even if Plaintiff can show a constitutional violation, they are entitled to qualified immunity because the relevant standards were not clearly established at the time of the alleged violations. After explaining the relevant legal standard, the court will address each of Plaintiff's claims.

### A. FIRST AMENDMENT STANDARD

It is well established that "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *Bell v. Wolfish*, 441 U.S. 520, 545

(1979). For instance, inmates keep First Amendment protections, including free exercise of religion. *Id.* (citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974). It is also well established, however, that "'[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.'" *Id.* (quoting *Price v. Johnston*, 334 U.S. 266, 285 (1948). "[L]imitations on the exercise of constitutional rights arise both from the fact of incarceration and from valid penological objectives--including deterrence of crime, rehabilitation of prisoners, and institutional security." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987).

In *Turner v. Safley*, 482 U.S. 78 (1987), the Supreme Court established the framework for evaluating the validity of prison regulations that restrict inmates' free exercise rights. Under *Turner*, such restrictions may be upheld only if they are "reasonably related to legitimate penological interests." *Id*. at 89. *Turner* identifies four factors relevant to the reasonableness determination which the Tenth Circuit has summarized as follows:

> First, the court considers whether there is a logical connection between the prison regulation and the asserted penological interest. Second, the court considers whether alternative means of exercising the religious right in question remain open to inmates. Third, the court assesses the impact the accommodation of the right in question would have on guards, other inmates, and on the allocation of prison resources. Fourth, the court considers whether any policy alternatives exist that would accommodate the right in question at *de minimis* cost to the prison.

*Hammons v. Saffle*, 348 F.3d 1250, 1255 (10th Cir. 2003) (internal citations omitted).

When applying *Turner's* "reasonable basis" test, courts must give appropriate deference to the expertise of prison authorities. *Turner*, 482 U.S. 78, 84-85. However, "'a reasonableness standard is not toothless'" and deference is not a rubber stamp; so, before bowing to the judgment and discretion of prison officials, a court should have evidence that the officials'

judgment and discretion have been carried out. *Thornburgh v, Abbott*, 490 U.S. 401, 414 (1989). Because the reasonable-basis test is designed to allow prison administrators to "anticipate security problems," officials can establish a valid, rational connection based on their past experience and intimate knowledge of institutional safety concerns. *Turner*, 482 U.S. 78, 89. An asserted justification must be accepted unless it is "so remote as to render the regulation arbitrary or irrational." *Id.* at 89-90. "[T]he absence of ready alternatives is evidence of the reasonableness of a prison regulation . . . [while] the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." *Turner*, 482 U.S. 78, 89-90.

**B. RELIGIOUS LAND ACT STANDARD**

In 2000, Congress passed the Religious Land Act. *See* 42 U.S.C.S. § 2000cc-1 (2014). The Act provides that "no [state or local] government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution," unless the government shows that the burden furthers "a compelling governmental interest" and does so by "the least restrictive means." *Id.* § 2000cc-1(a)(1)-(2).

The Religious Land Act applies to all persons confined to an institution that receives "federal financial assistance," *id.* § 2000cc-1(b)(1), and defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." *Id.* § 2000cc-5(7)(A). The Tenth Circuit has held that the Act applies in the prison context. *See Ahmad v. Furlong*, 435 F.3d 1196 (10th Cir. 2006). The Act includes an express private cause of action, which states: "A person may assert a violation of [the Religious Land Act] as a claim or defense in a judicial proceeding and obtain appropriate relief against a

government." 42 U.S.C.S. § 2000cc–2(a) (2014). For purposes of this provision, "government" includes, *inter alia,* states, counties, municipalities, their instrumentalities and officers, and persons acting under color of state law. *Id.* § 2000cc–5(4)(A).

Under the Religious Land Act, the plaintiff bears the initial burden of "produc[ing] prima facie evidence to support a claim alleging a violation of the Free Exercise Clause . . . ." *Id.* § 2000cc-2(b). To satisfy this burden a plaintiff must show that he: (1) is engaged in a religious exercise; (2) that the religious exercise is motivated by a sincerely held belief; and (3) that the exercise has been subjected to a substantial burden by correctional officers. *See Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1312 (10th Cir. 2010). If a plaintiff satisfies this initial burden, then the burden of proof shifts to the defendants to show that the substantial burden results from "compelling governmental interests" and that the government has employed the "least restrictive means" of accomplishing the compelling interest. 42 U.S.C.S. § 2000cc-1(a) (2014). Nevertheless, the burden of proof as to whether the challenged government practice substantially burdens the plaintiff's exercise of religion remains with the plaintiff. *Id.* § 2000cc-2(b).

In a recent case, *Sossamon v. Texas*, 131 S. Ct. 1651 (2011), the Supreme Court held that by accepting federal funding, states "do not consent to waive their sovereign immunity to private suits for money damages under [the Religious Land Act]." *Id*. at 1663. Therefore, Plaintiff is not entitled to money damages from Defendants in their official capacities under the Act.

Because the Religious Land Act mandates stricter scrutiny of government actions that burden inmates' religious freedoms than is required under the Free Exercise Clause, as applied by the Supreme Court in *Turner*, the Court will first analyze Plaintiff's claims under the the Religious Land Act framework.

7

## C. PLAINTIFF'S RELIGIOUS LAND ACT CLAIMS

1. Runes Claim

Plaintiff argues that by denying him wooden runes and offering only to substitute synthetic runes, the Prison violates his rights under the Religious Land Act because it is a substantial burden on his sincerely held Asatru belief. Plaintiff has submitted support for his claim that he is (1) engaged in a religious exercise, (2) holds a sincere belief that his religious practices require the use of runes made of natural materials and (3) the denial of wooden runes imposes a substantial burden upon his religious observances. Accepting for purposes of this motion only that this support is sufficient to satisfy the three elements of a Religious Land Act claim, the burden shifts to Defendants to show that there is a compelling government interests to impose this burden and whether Defendants have employed the least restrictive means of accomplishing the compelling interest. Defendants must show on a motion for summary judgment that under the undisputed facts a jury could only find that this burden had been satisfied.

Defendants argue that the Prison does not allow wooden runes for safety reasons. In support, Defendants present evidence that prison employees have witnessed small pieces of wood being used to jam a cell door or to circumvent a cell door's locking mechanism. (Burr Decl. ¶ 5; Balls Decl. ¶ 4.) Mr. Balls declares that he has witnessed at least four occasions where a piece of wood was used to circumvent security devices by jamming the wood into the locking mechanism at the Draper prison. (Balls Decl. ¶ 4.) Further, Mr. Balls states that he oversaw the craft area where wood was permitted until it was used to jam door locks, at which point it was removed from the craft area. (Balls Decl. ¶ 4.) Mr. Burr states that he has seen an inmate jam a

mechanical lock so that it appears that the security system is locked, in order to set a trap for an officer. (Burr Decl. ¶ 5.)

Plaintiff responds that wooden furniture is made at the prison and that inmates who work at the shop have brought pieces of wood back to their cells. He also points to other situations where prisoners have access to small wooden items, like Scrabble pieces and items in a medicine bag. Defendants counter that Plaintiff's examples are not sufficient to show that officials *allow* inmates to have wood in their cells, nor do they show that wood is not a safety risk. To succeed on this motion, however, Defendants must establish that drawing all inferences most favorably to Plaintiff, a jury could only conclude that Defendants' explanation creates a compelling interest that there is a safety concern. Given the other similar items that the Prison allows, such a conclusion is not required. A jury may reasonably conclude, again drawing all inferences in favor of Plaintiff, that the fact the Prison allows, or at least tolerates, similar wooden items the safety concern is not sufficient for the Prison to uniformly enforce its policy. Moreover, Defendants must demonstrate that the Prison's prohibition on wooden runes is the least restrictive alternative to achieve the safety objective. Given the dispute over other similar items that the Prison permits, the court cannot conclude as a matter of law that a reasonable jury could only find the prohibition on wooden runes to be the least restrictive alternative. In light of the conflicting evidence, Plaintiff has offered sufficient support to create a material issue of fact on whether wooden runes create enough of a safety and security to risk to completely abolish them from the Prison. There remains an issue of fact of whether in other circumstances small pieces of wood and other similar items are made available to inmates on a daily basis. It is therefore an issue of material disputed facts of whether a less restrictive alternative is available that would

satisfy relevant safety and security concerns without imposing significant burdens on the prison. Nevertheless, Plaintiff cannot prevail because of Defendants' qualified immunity, as is discussed hereafter.

2. Asatru Spiritual Ceremonies

Plaintiff further complains that Defendants violated the Religious Land Act and the First Amendment by not allowing him to conduct Asatru Blot ceremonies. (Compl., ¶ 31, Dkt. No. 6.) A Blot ceremony is alleged to require communal worship. Prison policy requires that a volunteer be present to monitor such communal worship services. For the past several years no volunteer has been available at the Prison to conduct or monitor Blot ceremonies. Plaintiff argues that the volunteer requirement--because it has for many years resulted in restricting Plaintiff to no Blot ceremonies at all--imposes a substantial burden on his religious exercise. He contends that Blot is an essential part of Asatru worship. (Compl., ¶ 21., Dkt. No. 6.) Defendants do not dispute that Blot is an essential part of Asatru worship and do not dispute for purposes of this motion that Plaintiff is a sincere Asatru adherent. Defendants argue, however, as they did to justify the prohibition of wooden runes, that their policy of requiring a non-inmate volunteer familiar with the Asatru to monitor or lead the Blot ceremony achieves a compelling interest in Prison safety and security and is the least restrictive means available to further this objective.

Using a case-by-case, fact-specific inquiry, courts have certainly held that policies requiring non-inmate volunteers for group worship are valid. *See, e.g.*, *Hathcock v. Cohen*, 287 Fed. Appx. 793, 800 (11th Cir. 2008) (applying *Turner* to decide volunteer policy reasonably related to security and budgetary concerns); *Adkins v. Kaspar,* 393 F.3d 559, 571 (5th Cir. 2004) (requiring outside volunteer did not substantially burden religious exercise); *Jihad v. Fabian*,

Civ. No. 09-1604, 2011 U.S. Dist. LEXIS 46930, at *31 (D. Minn. Feb. 17, 2011) (deciding volunteer policy not a burden because plaintiff had other ways to practice his religion); *but see Brown v. Alden*, No. CV-09-05089-CI, 2011 U.S. Dist. LEXIS 131347, **20-26 (E.D. Wash. Oct. 13, 2011) (denying summary judgment for state prison officials because record did not show why outside volunteer was necessary).

Defendants argue that the volunteer requirement furthers the Prison's safety and security purposes. Defendants offer evidence that allowing inmates to participate in group worship without a volunteer creates security problems. (Turley Decl., ¶¶ 13-17, Dkt. No. 61.) In previous years at the Gunnison facility, inmates were not required to have a volunteer present to engage in group worship; officers did a "walk through" to check and be sure inmates were engaged in appropriate activities. (Turley Decl., ¶¶ 18-22, Dkt. No. 61.) During that time, at least two serious incidents occurred: an Asatru inmate was seriously injured and required emergency medical treatment after the inmates engaged in "horseplay;" and in another incident, female corrections officers had their lives threatened after conducting a "walk through" check on Muslim inmates engaged in group worship. (*Id.* ¶¶ 23-25.)

Defendants also provide evidence that requiring an officer to be present during the entirety of group worship is not feasible. The evidence supports that there is inadequate staff to supervise group worship, (*id.* ¶ 31), and corrections officers are unfamiliar with Asatru teachings and would not know whether the activities the inmates engaged in were actually related to religious worship. (*See* Taylor Decl., ¶ 10, Dkt. No. 59.)

Defendants further offer evidence that officials have experimented with having corrections officers oversee group worship. In approximately 1997 and again in 2010, officers

who had knowledge and experience in a particular religious area were allowed to conduct group worship. In at least two instances, the officers became so friendly with the inmates, that they were no longer able to effectively get inmates to comply with their orders. (*See* Burr Decl., ¶¶ 38–43, Dkt. No. 57.) As a result, the officer involved ultimately became unable to continue to work effectively as a corrections officer in enforcing prison rules. And Defendants offer evidence that, for a time, inmates were allowed to meet for a group non-denomination service that was overseen by part-time chaplains. Ultimately, the group worship time became dominated by one particular religious group, which expressed views that promote ethnic and racial violence. (Koehler Decl., ¶¶ 13-20, Dkt. No. 64.) The chaplain-supervised open-congregate sessions were discontinued in 2009.

In addition to providing evidence that shows alternatives to the volunteer policy do not meet the prison's safety and security concerns, Defendants have provided evidence that they have located volunteers in the neo-pagan community who have experience in Wiccan and Asatru worship. (Turley Decl., ¶¶ 40–47, Dkt. No. 61.) The volunteers have been provided information about training. Plans are in progress which are intended to allow the Prison to resume providing the opportunity for religious services at the Prison. *Id.* at ¶¶ 45-47.

Plaintiff argues in response that a Wiccan volunteer cannot properly perform the ritual of Blot. He questions whether Defendants' limited foray into Utah's Asatru community was enough to rule out the possibility of more suitable volunteers and whether such volunteers are even necessary for the Prison to provide a safe and secure context for meaningful group worship. Nevertheless, Plaintiff fails to provide evidence of material facts that dispute the safety concerns raised by Defendants. Based on the evidence presented, a jury could only conclude that the

Defendants have acted out of legitimate safety concerns and that the evidence supports as a matter of law that there are compelling reasons to support the Prison policy. On this issue, summary judgment for Defendants is granted.

### D. EQUAL PROTECTION STANDARD

The Equal Protection Clause requires that "all persons similarly circumstanced shall be treated alike." *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 (1920). An equal-protection violation occurs when the government treats someone differently from another person who is similarly situated, without adequate justification for the difference in treatment. *City of Cleburne v. Cleburne Living Center, Inc.* 473 U.S. 432, 439-40 (1985).

A plaintiff alleging an equal-protection violation must present specific facts which demonstrate that a discriminatory purpose was a motivating factor in the decision attacked by the complaint. *Watson v. City of Kansas City*, 857 F.2d 690, 694 (10th Cir .1988). "'Discriminatory purpose' . . . implies more than intent as volition or intent as awareness of consequences. It implies that the decision maker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Adm'r v. Feeney*, 442 U.S. 256, 279 (1979) (citation & footnote omitted).

"[T]he standard of review . . . adopted in *Turner* applies to all circumstances in which the needs of prison administration implicate constitutional rights." *Washington v. Harper*, 494 U.S. 210, 224 (1990); *see Turner*, 482 U.S. at 85. This includes Equal Protection claims filed by prisoners. *Patel v. Wooteh*, 15 Fed. Appx. 647, 650 (10th Cir. 2001) (unpublished). Thus, in the prison religious context, equal protection does not require "that every religious sect or group within a prison—however few in numbers—must have identical facilities or personnel." *Cruz v.*

13

*Beto*, 405 U.S. 319, 322 n.2 (1972). Instead, prison officials must only ensure that an inmate of a minority religion enjoys "a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts." *Id*. at 322. This standard gives deference to prison administrators to determine which groups will be allowed to operate within the prison population. *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 136 (1977).

When faced with "the decision as to which of many groups should be allowed to operate within the prison walls, where, confronted with claims based on the Equal Protection Clause, the courts should allow the prison administration the full latitude of discretion." *Id.* Nothing in the Constitution requires prison officials to treat all inmate groups alike, particularly when differentiation is necessary to avoid disruption or violence. *Id.*

### E. PLAINTIFF'S EQUAL PROTECTION CLAIMS

Plaintiff argues that Defendants violated his right to equal protection of the laws by denying him rune sets and restricting his group worship, "while at the same time readily accommodating other similarly situated prisoners' religious and institutional practices." (Compl., ¶ 40, Dkt. No. 6.) In particular, Plaintiff argues that Native Americans are allowed "wooden medallions, sacred boxes, beads, and eagle feathers . . . ." (Plnts.' Defense Against Defs.' First Partial Mot. Summ. J., p. 8, Dkt. No. 65.) Plaintiff also argues that the volunteer policy is unequally enforced at the Prison, where other groups have been allowed group worship under circumstances different than those set forth by the same policy that, strictly adhered to, constrains Plaintiff from group worship in his religion of choice.

Defendants respond that this court has previously held that allowing Native American inmates to possess some wooden items, while not allowing Asatru followers to possess other wooden items--*in a maximum-security setting*--does not violate the Equal Protection Clause. *See Warner v. Patterson*, No. 2:08-CV-519 TC, 2011 U.S. Dist. LEXIS 124367, at **50-51 (D. Utah Oct. 27, 2011) (unpublished). Likewise, this court has held that the Prison offered "perfectly reasonable explanations for the lack of *Wiccan* religious services at the prison." *See Kay v. Friel*, 2:06-CV-23 TS, 2007 U.S. Dist. LEXIS 6391, at **9-10 (D. Utah Jan. 26, 2007) (emphasis added). Plaintiff has failed to proffer evidence sufficient to distinguish the holdings in the prior cases. Defendants have presented evidence that the security concerns upheld in the maximum security settings also apply in the remainder of the Prison. Plaintiff has failed to present evidence that Defendants' motivation for imposing these policies is a pretext or not based upon legitimate and reasonable concerns for safety. The court finds the reasoning of the prior cases persuasive and grants partial summary judgment in favor of Defendants on Plaintiff's equal protection claims.

### F. QUALIFIED IMMUNITY

Defendants assert that even if the court finds that Plaintiff has pleaded facts sufficient to avoid summary judgment, his claims are nevertheless barred by qualified immunity. "Qualified immunity is designed to shield public officials from liability and ensure that erroneous suits do not even go to trial." *Oliver v. Woods,* 209 F.3d 1179, 1185 (10th Cir. 2000) (quoting *Albright v. Rodriquez,* 51 F.3d 1531, 1534 (10th Cir. 1995). To defeat a defense of qualified immunity, a plaintiff must establish that the defendant's actions violated a specific statutory or constitutional right and that the right was clearly established when the alleged violation occurred. *Id.* Thus,

even if an issue of fact may exist as to whether the denial of wooden runes violated the Religious Land Act, Plaintiff must also prove that the "specific right" to have wooden runes was clearly established. Plaintiff cannot prevail on the second element to defeat the qualified immunity defense. No prior law has clearly established that the substitution of synthetic runes for wooden runes violated a statutory or constitutional right of Plaintiff. In fact, prior cases suggest just the opposite—that Defendants' policy and practices satisfied Defendants' statutory and constitutional obligations. *See, e.g., Warner*, 2:08-CV-519; *Kay*, 2:06-CV-23. Plaintiff cites no facts or authority that would distinguish his claims from the claims rejected in the prior cases. This court therefore grants Defendants qualified immunity.

## V. CONCLUSION

As the nonmovant, Plaintiff has failed to meet his burden on summary judgment. The Court therefore grants Defendants' summary-judgment motions as to Plaintiff's claims that they violated his rights under Religious Land Act and the Constitution.

## VI. ORDER

Accordingly, **IT IS HEREBY ORDERED** that:

(1) Defendants' Motions for Summary Judgment are **GRANTED** (*See* Dkt. Nos. 49 & 63.) The Plaintiff's claim for money damages from Defendants in their official capacities under Religious Land Act is dismissed with prejudice.

(2) Plaintiff's Motion for Default Judgment is **DENIED**.  (*See* Dkt. No.  # 44.)

DATED this 20th day of May, 2014.

        BY THE COURT

        _____
        CLARK WADDOUPS
        United States District Judge